# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| The premises located at 1208 Lime Avenue, Apartment B, Long Beach California | ) ) |
| Described further in Attachment A-3 | ) ) ) |

**FILED**
CLERK, U.S. DISTRICT COURT

**9/19/2022**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ib___ DEPUTY

Case No.   2:22-mj-03725-DUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-3*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Interference with Commerce by Robbery |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Special Agent Michael Fukuda*
_____
*Applicant's signature*

Michael Fukuda, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   9/19/2022

*Judge's signature*

City and state: Los Angeles, CA

Hon. Alexander F. MacKinnon, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kevin Butler, x6495

## **ATTACHMENT A-3**

PREMISES TO BE SEARCHED

The premises to be searched is located at 1208 Lime Avenue, Apartment B, Long Beach California, ("**SUBJECT PREMISES 3**"). **SUBJECT PREMISES 3**, as depicted in the photograph below, is a two-story, four unit apartment building located on the east side of Lime Avenue between Anaheim Street and Atlas Way in the city of Long Beach, California. **SUBJECT PREMISES 3** has a tan stucco exterior with a red shingled roof and white trim on the west facing windows. There are two white columns at the front entrance to the building, and another set of two white columns on the balcony over the front entrance. A short flight of approximately six red steps leads up from the sidewalk to the front entrance. Entrance into the building is made through the front door, which is brown with a glass window in the upper portion of the door. Unit B is located on the second floor of the building, on the south side of the building.



## ATTACHMENT B

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1951(a) (Conspiracy to Commit Interference with Commerce by Robbery, Interference with Commerce by Robbery) (the "Subject Offenses"), namely:

a.   DNA samples from Jimmy Lee VERNON, Deshon James BELL, and Ladell THARPE which are to be obtained via cotton/buccal swabs from the mouth Jimmy Lee VERNON, Deshon James BELL, Ladell THARPE; in obtaining the samples, law enforcement may use reasonable force should Jimmy Lee VERNON, Deshon James BELL, or Ladell THARPE, refuse to comply with execution of the search;

b.   Weapons, crowbars, hammers, or other tools similar to those used during the Luxury Jewels robbery;

c.   Clothing that matches or is similar to the clothing worn by VERNON, BELL, THARPE, K.J., or other Luxury Jewels robbers were wearing during the robbery of Luxury Jewels;

d.   Documents and records related to Luxury Jewels, including images of Luxury Jewels, internet history records showing visits to the Luxury Jewels website or other webpages referring or discussing Luxury Jewels, (such as Yelp! reviews and photographs), directions to the store, or maps showing its location;

e.   Documents and records reflecting the identity of, contact information for, communication with, or times, dates or

locations of meetings and robberies with co-conspirators
involved in the Luxury Jewels robbery, including calendars,
address books, telephone or other contact lists, correspondence,
receipts, records, whether contained in hard copy
correspondence, notes, emails, text messages, photographs,
videos (including items stored on digital devices), or
otherwise;

      f.   Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls from January 1, 2022, to the
present;

      g.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

      h.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

i.    Records, documents, programs, applications, materials, or conversations relating to the sale or purchase of stolen jewelry, including correspondence, receipts, records, and documents noting prices or times when stolen jewelry were bought, sold, or otherwise distributed;

j.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of stolen jewelry or merchandise;

k.    Contents of any calendar or date book;

l.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

a.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

b.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v. evidence of the times the device was used;

        vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.   records of or information about Internet Protocol addresses used by the device;

        ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## VIII.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress VERNON, BELL, or K.J.'s thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of VERNON, BELL, or K.J.'s face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Michael Fukuda, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrants against LADELL THARPE ("THARPE") and JIMMY LEE VERNON III ("VERNON") for a violation of 18 U.S.C. § 1951(a), Interference of Commerce by Robbery.

2.    This affidavit is also made in support of an application for a warrant to search the following:

a.    The premises located at 832 1/2 Via Wanda, Long Beach, California, 90805 ("**SUBJECT PREMISES 1**") as described more fully in Attachment A-1;

b.    The premises located at 2925 E. 7th Street, Apartment 303, Long Beach, California, 90804 ("**SUBJECT PREMISES 2**") as described more fully in Attachment A-2;

c.    The premises located at 1208 Lime Avenue, Apartment B, Long Beach California, 90813 ("**SUBJECT PREMISES 3**") as described more fully in Attachment A-3;

d.    The person of VERNON, as described more fully in Attachment A-4;

e.    The person of DESHON JAMES BELL ("BELL"), as described more fully in Attachment A-5;

f.    The person of K.J., a minor, ("K.J."), as described more fully in Attachment A-6; and

g.    The person of THARPE, as described more fully in Attachment A-7.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1951(a) (Conspiracy to Commit Interference with Commerce by Robbery, Interference with Commerce by Robbery) (the "Subject Offenses"), as described more fully in Attachment B.

4.    Among the evidence sought in Attachment B are samples of VERNON's, BELL's, and THARPE's deoxyribonucleic acid ("DNA"), which are to be obtained through cotton-buccal swabs in their respective mouths.  As discussed below, there is probable cause to believe that the DNA sought will match the DNA recovered from the vehicle, cell phones, and weapons left at the scene of the March 23, 2022 robbery of the Luxury Jewels of Beverly Hills jewelry store, 203 S. Beverly Drive, Beverly Hills, CA, 90212 ("Luxury Jewels").

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

6.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2008.  In September 2008, I completed 21 weeks of training at the FBI Academy in Quantico, Virginia, where I received formal training in criminal investigative tactics, techniques and evidence collection.  I have received training in, and have conducted, dozens of investigations of bank robberies, commercial robberies, and other violent crimes.  From September 2019 to the present, I have been assigned to the Violent Crimes Squad and worked as a Hobbs Act Robbery and Bank Robbery Investigator in the Los Angeles Division of the FBI.

7.    In connection with the robbery investigations in which I have participated, I have used a variety of investigative techniques, including witness interviews, speaking with law enforcement agents and officers, reviewing surveillance images and cellular telephone data, including cellular tower logs, as well as collecting and processing physical evidence.  As a result of this experience and my conversations with other law enforcement personnel, which includes FBI SAs experienced with bank robbery investigations and commercial robbery investigations, I am familiar with the methods used by individuals to commit robberies as well as effective investigative methods to solve them.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    On March 23, 2022, several suspects robbed Luxury Jewels using crow bars and other objects to smash the glass of a

display case and steal jewelry during business hours and with employees present.

9. Since then, and as described more fully below, law enforcement has determined that THARPE, VERNON, BELL, and K.J. perpetrated the robbery, based on the following:

a. THARPE, VERNON, and BELL's cellular telephone locations show them driving in tandem from Long Beach to Beverly Hills on the day of the robbery.

b. Surveillance video showed VERNON's phone falling from a robber's pocket during the robbery.

c. VERNON's DNA was found on his phone.

d. Seven days after he dropped his phone at the scene of the robbery, VERNON changed his number with his state probation officer.

e. THARPE posted pictures of stacks of cash on the day after the robbery on his Instagram account and captioned the picture with "robbery gang."

f. A search warrant of THARPE's iCloud account revealed a video THARPE had taken of the robbery crew wearing the identical clothes they wore during the robbery. Metadata for the vide showed that it was taken near VERNON's home about an hour before the robbery.

g. Records of THARPE's Instagram accounts showed that THARPE and VERNON discussed details of how to execute the robbery just before the robbery, including what vehicles to use (which corresponded to the vehicles actually used during the robbery) and what police scanner to buy.

h.   K.J.'s Instagram messages, call detail records, and VERNON's iCloud photo and video all corroborate K.J.'s involvement in the robbery.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Luxury Jewels of Beverly Hills is Robbed**

1.   <u>BHPD Responds to Robbery Report at Luxury Jewels</u>

11.   On March 23, 2022, at approximately 1:45 p.m., Beverly Hills Police Department ("BHPD") responded to a robbery that occurred at Luxury Jewels.  The robbery occurred in broad daylight, while employees and customers were in the store, and while the highly trafficked South Beverly Drive area was crowded.  Several eyewitnesses posted videos from the robbery to social media.

12.   The lead-up to the robbery, the robbery itself, and the robbers' flight were all caught on video in the streets of Beverly Hills, within the store itself, and by bystanders. Viewed in their totality, the video footage captured the following events in connection with the robbery:

a.   Around 12:28 p.m., a gray Kia Sportage SUV, California License Plate Number CA 8KWX037 (the "Kia SUV") made a left hand turn from Charleville Boulevard onto South Beverly Drive and five suspects got out of the Kia SUV.  All suspects wore sweatpants and sweatshirts with hoods up and were all holding various tools.

b.    The suspects ran towards the front of Luxury
Jewels and began hitting the glass display case at the front of
the store multiple times with various tools, including crowbars.
Once the glass shattered, the suspects grabbed items from the
front display of the store and ran northbound on Beverly Drive
(during which the owner of neighboring store attempts to stop
them), and then westbound on Charleville Boulevard.

c.    The suspects then ran south in an alley between
Beverly Drive and El Camino Drive where they disappeared from
view.

d.    The suspects left the Kia SUV at the scene.  Law
enforcement processed the abandoned Kia SUV for DNA and are
awaiting subject samples for comparison analysis.

    2.    <u>BHPD Reviews Video Surveillance of the Area and
Identifies Several Vehicles Moving in Concert</u>

13.  BHPD Detectives began their investigation by reviewing
the City of Beverly Hills' "Milestone"[1] video footage from
Gregory Way and El Camino Drive around the time of the robbery.
The video showed a newer model white Audi A6 sedan, California
License Plate Number 7JJG259 (the "Audi") that exited the
Beverly Drive/El Camino Drive alley into which the suspects were
last seen running after the robbery.  The Audi left the alley at
1:47 p.m. -- two minutes after the robbery.  The Audi was
driving close to the vehicle in front of it before travelling
westbound on Gregory Way.  BHPD determined that the Audi was

---

[1] Milestone is a surveillance video management software that
BHPD uses to analyze video footage from hundreds of cameras
within Beverly Hills to investigate crimes within Beverly Hills.

speeding and that the license was registered to a 2010 Audi in Long Beach, California, and did not match the much newer model of the Audi seen in the video.

14.   Later, BHPD reviewed Milestone video to identify when and how the Audi and the Kia SUV first entered Beverly Hills. In doing so, they observed the Audi and the Kia SUV entering the city together and moving in a coordinated fashion with a gray Ford Mustang convertible, California license plate 8VHG456 (the "Mustang").

15.   The vehicles can be seen driving northbound on Beverly Drive at approximately 12:28 p.m. with the Mustang in front, the Kia SUV in the middle, and the Audi in the rear.   The vehicles then turn eastbound on Olympic Boulevard, then northbound on Canon Drive, which is a residential area.   The vehicles then turn westbound on Gregory Way, northbound on Reeves Drive, eastbound on Charleville Boulevard, and southbound in the Canon Drive/Reeves Drive alley -- all together.

16.   The Mustang license plate returned to an Enterprise rental vehicle.   BHPD called and Enterprise confirmed that the Mustang was rented to THARPE from a Long Beach rental location. The number THARPE used to rent the car was 323-358-6132 ("Tharpe Cell").

17.   A review of the DMV information for the Kia SUV confirmed that it was reported stolen out of Long Beach (just as the Mustang had been rented from Long Beach and the Audi plate stolen from Long Beach), on March 19, 2022, four days before the robbery.

###      3.    BHPD Identifies VERNON's Cellphone as a Phone
              Left by One of the Robbers at the Scene

18.   After obtaining CCTV from the Luxury Jewels cameras, BHPD identified a suspect whose cell phone fell from his sweatpants pocket while he smashed the jewelry store window.

19.   After the suspects fled, the cell phone was recovered by the store owner and BHPD took custody of it.  On March 23, 2022, BHPD obtained a state search warrant for the phone.  BHPD was able to determine that the number was associated with the phone was 562-270-8951 ("Vernon Cell").

20.   Separately, BHPD received a phone call from Long Beach Police Department Detective Martinez stating that the modus operandi of the robbery matched several smash and grabs in Long Beach in recent weeks.  In discussing the case, BHPD asked LBPD to run Vernon Cell number in their databases.  LBPD identified Vernon Cell as one that VERNON had been provided as his phone number during a 2020 arrest.

21.   BHPD conducted a wants and warrants check on VERNON and confirmed he was on formal probation for a burglary and residential burglary.  On March 24, 2022, BHPD called VERNON's Los Angeles County Probation Officer and confirmed that VERNON was on probation and that the number he provided to probation was Vernon Cell.

22.   VERNON's physical descriptors (height and weight) match the subject observed in the video surveillance of the Luxury Jewels robbery.

23.  On March 31, 2022 -- seven days after the Vernon Cell phone was dropped during the robbery -- VERNON called his probation officer and changed his number on file.

24.  Lab technicians with the Verdugo Regional Crime Laboratory were able to recover a DNA profile from the phone dropped by one of the Luxury Jewels robbers during the robbery. Lab personnel then uploaded the DNA profile to the California Department of Justice's ("CALDOJ") Combined DNA Index System ("CODIS") to see if the DNA profile matched those of any DNA profiles already in the system.  In April 2022, CALDOJ provided a report indicating that the DNA profile recovered from the robbery suspect's cell phone was a match for VERNON's DNA profile from the CODIS system.

### 4.   BHPD Recognizes THARPE's Name from Enterprise

25.  On March 23, 2022, when an LBPD detective called BHPD about the similar modus operandi robberies in Long Beach, he also provided THARPE's name as a potential suspect in the recent burglaries/robberies in Long Beach.  When BHPD received the same name from Enterprise as the renter of the Mustang, detectives contacted LBPD and learned that THARPE was currently wanted for his involvement in the burglaries as well as an assault with deadly weapon charge from an incident on March 5, 2022.  LBPD also informed BHPD that THARPE is on Federal Supervised Release and had an outstanding violation for which he was arrestable.

26.  LBPD further advised that LBPD patrol officers attempted to conduct a traffic stop of THARPE while he was driving the Mustang on March 13, 2022, but that he fled,

escaped, crashed the Mustang, and abandoned it.  During a follow-up with Enterprise, BHPD determined that: (i) THARPE had rented the Mustang through his insurance; (ii) THARPE had filed an insurance claim for the damage sustained after the Mustang crashed on March 13, 2022, after the high speed flight from police.  The insurance claim information lists Tharpe Cell as THARPE's number.

     5.   <u>BHPD Identify BELL's Cell Phone Number Based on Frequent Contacts with THARPE Around the Time of the Robbery</u>

27.  When BHPD originally pulled the Tharpe Cell tolls, they found several calls that THARPE made to (404) 790-7575 ("Bell Cell") on the day of the robbery.  The number was subscribed to Larry Brooks, Sr. in Long Beach.  An LBPD arrest report of BELL's revealed that BELL provided Bell Cell as his number and identified Larry Brooks, Sr. as his father.  BHPS then did surveillance on an address they believed to be BELL's, saw BELL, called the Bell Cell number, and saw (and photographed) BELL answering the phone call live.

     6.   <u>Call Detail Records Place VERNON, THARPE, and BELL at the Robbery</u>

28.  On March 25, 2022, BHPD obtained search warrants for the call detail records, showing the location of Tharpe Cell, Vernon Cell, and Bell Cell.  THARPE's records were consistent with the robbery and the Mustang's movements as his phone is observed hitting on cell towers in the City of Beverly Hills on the day of the crime and in the area the Mustang was seen

driving at the time the Mustang was in the city.  VERNON and
BELL's locations are also consistent with the robbery.

29.  The CDRs show that Tharpe Cell, Vernon Cell, and Bell
Cell are close to each other in Long Beach in the mid-morning.

a.  Bell Cell and Tharpe Cell are then shown near
Nickerson Gardens, likely in transit to Beverly Hills around
noon.

b.  Vernon Cell, Tharpe Cell, and Bell Cell are then
together near the crime scene.

c.  Tharpe Cell and Bell Cell then traveled to the
77th Division area.  Shortly after, Tharpe Cell goes to the
jewelry district downtown and has two short incoming calls (562-
549-9379 and 310-404-7619).  Tharpe Cell did not have any other
calls with these numbers on any other days.

d.  Tharpe Cell and Bell Cell are then seen
travelling back to Long Beach.

e.  Bell Cell was used to order Domino's at 5:26 p.m.
to 5101 S. Broadway, near where Bell Cell was located.

30.  Tharpe Cell also made a call to Vernon Cell number on
the day of the robbery at 11:06 a.m. -- two hours before the
robbery.  After that call, Tharpe Cell exchanged numerous phone
calls with Bell Cell between 11:25 a.m. and 3:21 p.m.  Five of
those calls occurred leading up to the robbery and one was made
after the robbery.

a.  Bell Cell and Tharpe Cell are then together from
8:30 – 9:30 p.m. in Whittier area.

**B.    THARPE is Arrested on March 29, 2022**

31.   On March 29, 2022, LBPD located THARPE and the Mustang
at the address listed on the Enterprise Rental agreement -- 631
E. 19th Street, Long Beach, California.  LBPD then obtained an
arrest warrant for THARPE and search warrant for THARPE's
apartment, to include digital devices found at the location.
When LBPD announced their presence, THARPE barricaded himself
inside but was eventually taken into custody on the outstanding
flight and assault warrants and the Mustang was impounded.  LBPD
seized, among other things, an iPhone 11 with distinctive case
that they had seen THARPE using.  On April 12, 2022, BHPD then
obtained a search warrant for the phones LBPD seized from THARPE
during his arrest.

**C.    THARPE's and VERNON's Instagram Accounts Further
        Corroborate Their Involvement in the Robbery**

32.   In their initial investigation, BHPD obtained search
warrants for THARPE and VERNON's suspected Instagram accounts.

1.   THARPE's Instagram Flouts Robbery Profits

33.   BHPD located a profile that appears to belong to
VERNON as well as several profiles that appear to belong to
THARPE based on appearances and distinctive tattoos.  On May 27,
2022, BHPD obtained a search warrant for THARPE's Instagram and
on May 30, 2022, BHPD obtained a search warrant for VERNON's
Instagram.

34.   On March 25, 2022 -- two days after the robbery --
THARPE posted to his Instagram account "blamp_camp_zavey"
numerous photos corroborating his involvement in the robbery.

The first was a THARPE and a group of males all holding large stacks of cash with the caption "BAD ASSES BABIES."  The second was THARPE holding an extremely large stack of rubber banded cash with the caption "#MOOD."  The third was another large stack of cash with the caption "BENZES & TRACKHAWKS."  The fourth was a note that read "Ya Niggas Really Be Cool with Niggas Who Won't Put You On To No Money Moves My Whole Team Work Together and Help Eachother Any Way We Can. I'm Good WIthat th My Gang 100 No One Starves And No One Jealous Of The Next Man. Hope Ya Can Say The Same About Ya Team 100 100."  It ended "-ROBBERY-GANG-."

  2.  THARPE and VERNON Appear to Discuss Robbery via Instagram

35.  Returns on VERNON's Instagram show conversations with THARPE's account that appear to discuss the robbery.[2]  First, on February 9, 2022:

  - THARPE: What's the plot
  - THARPE: I need a fast 300
  - THARPE: We got a whip
  - VERNON: What kind
  - THARPE: Audi
  - THARPE: We can get a kia suv tho

36.  Surveillance video showed the robbers and accomplices traveling in an Audi and Kia SUV, the same cars that THARPE suggest that he and VERNON use in their "plot."

---

  [2] Returns for THARPE's account did not show the same messages with VERNON, suggesting they were intentionally deleted.

37.   Later, on March 14, 2022 -- a week prior to the robbery -- VERNON and THARPE discussed a police scanner:

- THARPE: That's scanner came
- VERNON: Bet gotta program her
- THARPE: Mando
- THARPE: Gone sent a photo
- (THARPE then sends a photograph of a police scanner)

38.   On March 22, 2022, the day before the robbery, at 12:03 p.m., THARPE messaged Instagram account "tha3king" "What whip next dog."  "tha3king" responded "A6 & low key whip." Again, this would correspond to the make (and in the Audi's case, the make and model) of the cars used in the Luxury Jewels robbery.

39.   On March 23, 2022 -- the day after the robbery -- THARPE also sent a link to a story about the robbery to an undinteified instagram user.

**D.    THARPE's iCloud Corroboration**

40.   BHPD also obtained a search warrant for THARPE's iCloud backup.  Among the deleted files was a video of the robbery crew on the morning of the robbery, March 22, 2022, at 11:09 a.m., featuring many members wearing the same exact clothing as the robbery but without face masks they later donned during the robbery.

41.   In particular, the video clearly shows K.J.'s face walking in front of the camera, again in the same exact clothing that is seen the same day depicting the robbery itself.

42.   The person taking the video -- believed to be THARPE, both based on the fact that it is in his iCloud account and his

appearance -- also walks up to a vehicle with tinted windows and can be seen in the reflection.

43.   The white iPhone 11 with different colored case that is seen in the reflection is also consistent with the iPhone 11 that LBPD officers saw THARPE using during surveillance and that was later recovered from his home.

44.   The location of the video has been determined to be E. Via Wanda in Long Beach.

45.   One of VERNON's known addresses, **SUBJECT PREMISES 1** -- just two blocks from where the video was taken.

46.   At 11:25 a.m., Tharpe Cell CDRs confirm that his phone was in the vicinity of the location the video was taken.

47.   At the same time, Bell Cell is in the same area as Tharpe Cell.

### E.   Further Investigation Shows K.J.'s Involvement in the Robbery

48.   Instagram returns for THARPE's accounts have consistent video calls and messages with "lil9ina_" on March 22, 2022.  The "lil9ina_" account was confirmed with K.J.'s phone number, which was subscribed to by him.  Further, conversations both before and after the robbery on the account refer to K.J. by his full name.

49.   Instagram returns for BELL's account also shows messages between BELL's and K.J.'s account as well, including BELL's account stating "Get ready dawkg we finna come getchu" and "Like 30mins" at 9:27 a.m. and "We out way dawkg" at 9:51 a.m.  THARPE's CDRs are consistent with these messages.

50. K.J.'s phone number, which was used to verify his Instagram account, was subscribed to K.J.

51. The previously discussed photo and video from THARPE's iCloud depicts K.J. in the same pants, hoodie, and shoes that are soon after seen being worn by one of the robbers on the Luxury Jewels security footage.

### F. Investigation Confirms that VERNON, BELL, and K.J. Reside at SUBJECT PREMISES 1-3

52. On August 26, 2022, I reviewed a text message thread that was obtained from the Vernon Cell pursuant to a search warrant. During an exchange on October 24, 2020, regarding a location to drop off a delivery of alcohol, VERNON texted the address for **SUBJECT PREMISES 1.**

53. On August 11, 2022, investigators set up surveillance at **SUBJECT PREMISES 1.** Investigators observed VERNON driving a black Infiniti 4 door sedan and park it at **SUBJECT PREMISES 1.**

54. Later that day, law enforcement observed VERNON as he exited the front door of **SUBJECT PREMISES 1** and briefly entered an attached exterior that appeared to be a laundry room.

55. On May 13, 2022, I reviewed BELL's criminal history reports, which lists **SUBJECT PREMISES 2** as one of BELL's residences. I also reviewed BELL's DMV records, which lists **SUBJECT PREMISES 2** as one of BELL's addresses on record.

56. On August 11, 2022, investigators set up surveillance at **SUBJECT PREMISES 2.** Investigators observed BELL exiting the front door of **SUBJECT PREMISES 2.** Investigators observed BELL

walk next door to a Mexican restaurant, pick up food, and reenter **SUBJECT PREMISES 2** through the front door.

57.   During the surveillance, Bell Cell was pinging at the same location.  Law enforcement then called Bell Cell from a blocked number and witnessed BELL answer the phone through his headphones.

58.   On August 31, 2022, I reviewed K.J.'s criminal history report, which lists **SUBJECT PREMISES 3** as his residence. Furthermore, on August 31, 2022, I reviewed K.J.'s DMV records, that shows that on July 21, 2022, K.J. provided **SUBJECT PREMISES 3** as his residence address in his application for a California driver's license.

59.   On August 11, 2022, investigators set up surveillance at **SUBJECT PREMISES 3**.  Investigators observed an individual matching K.J.'s appearance leave on foot from the front entrance to the apartment building where **SUBJECT PREMISES 3** is located.

60.   On August 13, 2022, investigators set up surveillance at **SUBJECT PREMISES 3**.  Investigators observed K.J. exit the front entrance of the apartment building where **SUBJECT PREMISES 3** is located.

61.   On September 14, 2022, investigators surveilled **SUBJECT PREMISES 2**.  There, they observed BELL exiting the apartment building of **SUBJECT PREMISES 2** with a scooter. Several minutes later, BELL returned and re-entered the apartment building.  During the surveillance, the Bell Cell was pinging at the same location.

62.  On September 14, 2022, investigators set up surveillance on **SUBJECT PREMISES 1**.  Investigators observed VERNON exit **SUBJECT PREMISES 1** with an unknown individual. Investigators observed VERNON and the unknown individual enter a black Infiniti four door sedan.  VERNON drove the vehicle away. Approximately ten minutes later, VERNON and the unknown individual arrived back at **SUBJECT PREMISES 1**.  VERNON parked the black Infiniti directly in front of **SUBJECT PREMISES 1**. VERNON, the unknown individual, and a minor entered **SUBJECT PREMISES 1**.  During the surveillance, Vernon Cell was pinging consistent with VERNON's movements observed by surveillance.

63.  On September 15, 2022, investigators set up surveillance at **SUBJECT PREMISES 2**.  Investigators observed BELL and two other unidentified males enter the apartment building of **SUBJECT PREMISES 2**.  BELL opened the front door of apartment 303 and entered, followed by the two unidentified individuals. During surveillance, Bell Cell was pinging consistent with BELL's movements observed by surveillance.

### G.  Criminal Histories

64.  THARPE has criminal convictions for Evading a Police Officer (2022), Assault with a Deadly Weapon (2018), Burglary (2018), Burglary (2014), Participation in Street Gang (2014), and Carjacking (2007).

65.  VERNON has criminal convictions for Counterfeiting (2021), Felony Failure to Appear (2021), Firearm Access Violation (2021), Burglary (2021), False ID to Police Officer

(2018), Possession of Controlled Substance (2017), and Firearms Access Violation (2017).

66. BELL has no criminal convictions but arrests for Petty Theft (2020), Robbery (2019), 2nd Degree Robbery (2019), Assault with a Deadly Weapon (2019), and 1st Degree Robbery (2018).

## V. TRAINING AND EXPERINCE ON ROBBERIES

67. From my training, personal experience, and the collective experiences related to me by other more experienced law enforcement officers who conduct robbery investigations, I have learned that robbers will use cell phones or smart phones for some or all of the following reasons:

a. They will use website mapping programs (i.e. Google or Bing) to see where target stores are located in a specific area;

b. They will search online newspaper articles to read what information is available regarding the robberies;

c. They will search online newspaper articles or websites dedicated to unknown robbery subjects to view the bank security images of the robbery/robber;

d. They will use their phone to:

i. Take photos/video of potential locations they considered targeting.

ii. Take photos of the items they have taken from a robbery.

iii. Take photos of trips or places they have been following a robbery – at times showing an influx of income they normally did not have;

         iv.   They will send text messages to coconspirators and/or associates/friends indicating what (criminal) activities they have been engaged in;

         v.   They will use the mapping application on their phone to get directions to/from a location;

         vi.   They will send communications (including photographs of stolen merchandise) to prospective buyers of stolen merchandise, including "fences".

         vii. Communications between the robber and any accomplices, such as a getaway driver.

     e.   In addition, the search of a cell phone can reveal GPS location information including historical location data to show whether the robber's phone was located near the robberies around the time of those robberies.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

68.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

     a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

2.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

3.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress VERNON, BELL, or K.J.'s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of VERNON, BELL, or K.J.'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

### VII. CONCLUSION

For all of the reasons described above, there is probable cause to believe that THARPE, VERNON, and BELL have committed a violation of 18 U.S.C. § 1951(a) (Interference with Commerce by Robbery).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of **SUBJECT PREMISES 1-3** described in Attachments A-1, A-2, A-3, and the persons of VERNON, BELL, K.J., and THARPE as described in Attachment A-4, A-5, A-6, and A-7.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 19th day of
September, 2022.

UNITED STATES MAGISTRATE JUDGE
ALEXANDER F. MacKINNON